# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### HAMMOND DIVISION

MAGNESITA REFRACTORIES )
COMPANY, )
)
             Plaintiff, )
)     CAUSE NO. 2:16-CV-524-PPS-JEM
    v. )
)
SURENDRA MISHRA, )
)
          Defendant. )

## OPINION AND ORDER

Defendant Surendra Mishra wants the *ex parte* Temporary Restraining Order that I issued in December dissolved. [DE 39.] A hearing on his motion was held on February 1, 2017 at which I denied the motion and said that I would issue an order further explaining the reasons for my decision. [DE 43.] This is that order.

I think it is helpful to provide some background regarding the issuance of the *ex parte* Temporary Restraining Order before considering Mishra's motion to dissolve it. Here's what happened. Mishra's employer, Magnesita Refractories Company, filed a complaint alleging violations of the recently enacted Defend Trade Secrets Act, *see* 18 U.S.C. § 1836, and the Indiana Uniform Trade Secrets Act. It also requested an *ex parte* TRO. At a hearing on December 20, 2016, I entered an *ex parte* TRO authorizing, among other things, the seizure of a laptop computer owned by Mishra that he used for both business and personal purposes. I was persuaded that Magnesita had made the requisite showing that there was a strong likelihood that Mishra was conspiring to steal

Magnesita's trade secrets contained on the laptop, and that the seizure was necessary to prevent the impending harm. Mishra initially refused to comply with my Order, but subsequently appeared at a hearing on December 22, 2016 and surrendered his laptop to the Court, where it has been housed in Clerk's Office vault ever since.

At the December 22, 2016 hearing, a date for the preliminary injunction hearing was set and Mishra agreed to the extension of the TRO until that date. [DE 15; DE 49 at 22-23.] I also ordered the parties to brief the issue of what should happen with the laptop, with a focus on whether a Special Master should be appointed to deal with the issue. [DE 19, 20.] I heard from both parties regarding that issue at a January 9, 2017 hearing. The hearing was then sidetracked by a new issue raised for the first time by Mishra. He claimed that Federal Rule of Civil Procedure 64 applied to the seizure of his laptop and this mandated that the procedural requirements of the DTSA, rather than Federal Rule of Civil Procedure 65, applied to the seizure of the laptop, and required the return of the laptop. I asked the parties to brief that issue. [DE 29-31, 33-34.] I moved the preliminary injunction hearing date to allow the parties to brief the issue and, once again, Mishra consented to the extension of the TRO while they did so. [DE 46 at 12-13.]

I ultimately found in a written opinion that Rule 64 did not apply to the seizure of Mishra's laptop in this action and denied Mishra's request to return the laptop. [DE 37.] I then ordered the appointment of a Special Master to image the laptop so that it

may be returned to Mishra, noting that I would issue an Appointing Order establishing duties of the Special Master.  [DE 39.]

It was only after all of this—3 hearings, 2 rounds of briefing issues related to the disposition of the laptop, 2 agreements to the extension of the TRO—that Mishra filed his motion to dissolve the TRO, arguing that the *ex parte* proceedings were improperly conducted, the scope of the TRO is overly broad, and the TRO is facially defective.  [DE 40.]  I was surprised to learn that he made the motion without bothering to review the transcript from the hearing on the TRO at which I explained in greater detail than that contained in the actual TRO my reasons for issuing it.

The decision to grant or deny a TRO, whether it be one made with or without notice, starts with a review of the operative rule, Federal Rule of Civil Procedure 65(b)(1).  Here's what the rule says:

> The court may issue a temporary restraining order without written or oral notice to the adverse party or its attorney only if:
> (A) specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition; and
> (B) the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required.

A temporary restraining order is "an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing , carries the burden of persuasion."  *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1992) (per curiam).  To warrant a TRO, a plaintiff must demonstrate:  (1) a likelihood of success on the merits; (2) no

adequate remedy at law exists; and (3) plaintiff will suffer irreparable harm if the TRO is not granted. *See Incredible Techs., Inc. v. Virtual Techs., Inc.*, 400 F.3d 1007, 1011 (7th Cir. 2005). If these elements are satisfied, the Court must then balance the harm to the plaintiff if the restraining order is denied against the harm to the defendant if the restraining order is granted. *Id.*

Along with its motion for an *ex parte* TRO, Magnesita provided a certification of its attorney declaring that notice should not be required because "it is believed that Defendant will take steps to delete or modify evidence contained on a personal laptop . . . in his possession . . . [and that] [d]estruction of this key evidence will irreparably harm Plaintiff," DE 6-1- at ¶2. Magnesita also provided as an exhibit to its complaint, an affidavit from Gustavo Franco, the Vice President Sales & Marketing for Magnesita. [DE 1-1.] Franco explained that a former Magnesita Group[1] Director of Sales and Marketing, Zelber Dettogne do Nasciemento, was suspended and eventually terminated for a pattern of misconduct involving improper financial payments to persons employed by Magnesita Group. He explained that as part of Magnesita's investigation into Dettogne's conduct, Magnesita identified certain emails sent to/from Mishra's personal email account that demonstrated Dettogne and Mishra's intent to create an entity with a Magnesita supplier (Xiangrong) and at least one individual at a company that had a business cooperation agreement with one of the Magnesita Group

---

[1]The Magnesita Group of Companies is "a global group of companies, based in Brazil, which is dedicated to mining, producing and marketing an extensive line of refractory materials and various services." [DE 1-1 at ¶2.]

Companies (that company being ACIS) to compete with Magnesita and the Magnesita Group. [*Id.* at ¶¶4-9.]

More specifically, Franco's affidavit quotes a series of emails, attached as exhibits to the affidavit, indicating that Mishra, Dettogne, and representatives from ACIS and Xingrong planned a meeting at a hotel in Hammond, Indiana during the week of December 19, 2016 to discuss potential refractory business ventures independent of Magnesita. [*Id.* at ¶10.] In an email from Dettogne sent to Wang Yong of ACIS and Mishra, Dettogne listed several discussion points for the "kick-off meeting" including:

- Discussion of the business plan;
- Presentation of the market intelligence and market strategies;
- Alignment of the business model between Producer and Prime Refractories;
- Sales and technical training in refractories;
- Discussion of structure . . in the main region in order to move aggressively in the market.

[*Id.* at ¶11.] Mishra evidently was pleased with the email setting the agenda for the "kick off meeting." Here's what he said in reply: "I am very happy to read the e-mail and warmly welcome you to our inaugural meeting in Chicago." [*Id.* at ¶12.] He went on to note that he invited Fan Xiaoming, CEO of Xiangrong, to join the meeting and offered to help with hotel reservations. [*Id.*] There's more. On December 15, 2016, Wang Yong sent an email to Mishra stating, "I have just finished company registration paper with [Dettogne] in JAFZO using your passport copies," and that he would arrive in Chicago December 19, 2016 and asked that he be booked in the same hotel as Fan Xiaoming. [*Id.* at ¶13.]

Based on this evidence, Magnesita reasonably believed that it potentially had a rogue employee who was scheming to harm its business interest and it, therefore, requested an *ex parte* TRO on December 19, 2016. In its motion, Magnesita sought to preserve the data on Mishra's devices, both his personal laptop that he also used for business purposes and his cell phone, stating that it would like to obtain the devices and create a digital image of them to avoid the risk of deletion or usage and to preserve the status quo. [DE 3; DE 45 at 2-3.] It also sought to restrain Mishra from violating both the Defend Trade Secrets Act and his employment agreement by disseminating confidential trade secrets. [*Id.*]

I acknowledged at the *ex parte* TRO hearing that "I have to be extra vigilant in making sure I am protecting the interest of the party that's not present." [DE 45 at 2.] At that hearing, I denied the TRO as to Mishra's cell phone because the Franco affidavit and briefing was silent as to concerns regarding Mishra's cell phone. [*Id.* at 9-10.] In addition, I expressed my concern about the seizure of the laptop because it was used for both business and *personal* purposes and would potentially contain personal information. [*Id.* at 4-5.] At the *ex parte* TRO hearing, I contemplated several options to deal with the laptop, including allowing Magnesita to confiscate the laptop and have it imaged, sending the U.S. Marshal to seize the laptop to be placed in court custody, or only issuing an order telling Mishra not to disseminate or destroy any material on the laptop and asking him to bring the laptop to a hearing a couple of days later. [*Id.* at 5-

7.]  In conducting this analysis, I noted that "I have to try to devise the most narrow relief to achieve the objectives that the injunction is trying to achieve."  [*Id.* at 8.]

After reviewing the evidence and hearing from Magnesita's counsel at the *ex parte* TRO hearing, I found the Magnesita met the requirements for the issuance of an *ex parte* TRO under Rule 65(b).  [*Id.* at 11.]  As I explained at the hearing, I found that Magnesita demonstrated a likelihood of success on the merits by presenting evidence that Mishra, a Magnesita Vice President in possession of Magnesita's confidential trade secrets, was in contact with a former Magnesita employee and Wang Yong, a CEO of a company in a similar business to Magnesita, and it appeared that meetings had been arranged and were being conducted to discuss the possibility of a new venture between the three gentlemen in violation of Mr. Mishra's employment agreement.  [*Id.* at 12.]  As I stated on the record, "[t]hose e-mails strike me as strong evidence of a likelihood that trade secrets are going to be exchanged and used by the defendant and disseminated to potentially this new venture that is ostensibly being formed."  [*Id.* at 12-13.]

I also found that "there would be no remedy at law if the computer that's at issue here is not obtained" and that "there is a high likelihood that material would be disseminated . . . and that's irreparable harm as I see it."  [*Id.* at 13.]  In balancing the harms, I found that the *ex parte* TRO that I would ultimately issue would cause modest harm to Mishra.  Rather than involve the U.S. Marshal Service, and the potential reputational damage caused by them seizing Mishra's personal property at his place of employment, I ordered Mishra to turn over to Magnesita's counsel his personal laptop,

which Magnesita would immediately deliver to the Clerk of Court to be secured. [DE 10 at 3.] To ensure the protection of Mishra's privacy, I ordered that "Magnesita shall not review any of the contents of the laptop prior to delivering it to the Clerk of Court." [*Id.*] In order to provide Mishra a way to expeditiously address any issues regarding the *ex parte* TRO, discuss the disposition of the laptop and potential appointment of a Special Master to image the laptop, and set a date for a preliminary injunction, I ordered the parties to appear at an in person hearing two days after I issued the *ex parte* TRO. [*Id.*] Finally, I noted at the *ex parte* TRO hearing "[t]here is, of course, a public interest that trade secrets and proprietary information remains private and remains the property of the people who own it," which militated in favor of issuing the *ex parte* TRO. [DE 45 at 14-15.]

Mishra's challenges to the validity of the *ex parte* proceedings and TRO fail. First, Mishra's challenge to the validity of the *ex parte* proceedings, DE 40 at 5-6, fails because the requirements of Rule 65(b)(1)(B) for issuing a TRO without notice were met by the certification of Magnesita's attorney that notice should not be required because "it is believed that Defendant will take steps to delete or modify evidence contained on a personal laptop . . . in his possession . . . [and that] [d]estruction of this key evidence will irreparably harm Plaintiff," which I found particularly persuasive given the additional evidence provided in Franco's affidavit and attached emails regarding Mishra's activities. [DE 6-1- at ¶2.] Second, Mishra's challenge to the scope of the TRO, DE 40 at 7, fails because the relief it grants is narrowly tailored to the purpose of

preserving the status quo and preventing irreparable harm until a hearing can be held. As is clear from the record, I considered both broader and narrower constructions of the TRO, DE 45 at 5-8, DE 49 at 3-4, and, taking Mishra's privacy interest, Magnesita's business interest, and the public interest in protection of trade secrets into consideration, ultimately concluded that the middle ground, which ordered a seizure of Mishra's laptop but left it in secured custody of the Court, best achieved the goal of maintaining the status quo by preventing the dissemination of trade secrets and the destruction of evidence.

Mishra challenges the facial validity of the TRO, claiming that it neglects to describe the injury and state why it is irreparable. [DE 40 at 7.] That's incorrect. The TRO states that "for the reasons stated on the record" Magnesita "has suffered injury and will continue to suffer irreparable injury" because "Mishra has utilized and/or threatens to utilize Magnesita's confidential and trade secret information without Magnesita's knowledge or consent." [DE 10 at 1-2.] It explains that "Magnesita's losses are not yet fully known or readily calculable." [*Id.* at 2.] While I understand that Mishra wishes that this explanation was more robust, it is sufficient to meet the standard established in Rule 65(b)(2), especially given the additional detail provided in the record. *See American Can Co. v. Mansukhani*, 742 F.2d 314, 325 (7th Cir. 1984) ("The requirements of Rule 65(b) need not be burdensome when there is truly a need to proceed *ex parte*. The requirements at issue here demand only that the judge issuing the

order articulate, and thus carefully consider, both the need for the restraining order and the need for proceeding ex parte.").

Mishra now asks me to undo what I did at the *ex parte* hearing. To achieve that result, he filed the motion to dissolve the TRO and also requested an immediate hearing. He received that hearing two days later, on February 1, 2017. [DE 43.] Mishra testified at that hearing. The sum and substance of his testimony was that inferences that I drew from the evidence presented to me at the *ex parte* hearing were incorrect. He said that there was an entirely benign reason for him to be discussing the creation of a potentially competitive company with a terminated Magnesita employee, a Magnesita supplier, and a Magnesita competitor and arranging a local "kickoff meeting" via private email. I am not convinced.

In explaining his relationship with the individuals listed in the emails, Mishra testified that Xiaoming is a personal friend of his and that Mishra became friends with Dettogne after he joined Magnesita in February 2014 and they had both a professional relationship and personal friendship. [DE 47 at 14-15.] Mishra testified that when news of Magnesita's merger with RHI, the company from which Magnesita hired Mishra, was announced in October 2016, Dettogne, who was living in Dubai, was worried he might lose his job and was concerned that if he did, he would lose his residency work permit in Dubai and would have to leave, removing his daughter from school in Dubai. [*Id.* at 19.] Mishra testified that the project referenced in the emails, the "Prime Project," was a company that Dettogne was thinking of forming so that he could be issued a residency

10

work permit to continue to stay in Dubai. [*Id.* at 19-20.] Mishra clarified on cross-examination that the company was an insurance plan for Dettogne through which he could start selling materials, including refractories, and it could have been competitive with Magnesita. [*Id.* at 33.]

Mishra testified that Dettogne was of the opinion that he, Mishra, Xiaoming, and Wang would be members of this company, but Mishra says this was a misunderstanding that he clarified later on. [*Id.* at 20.] Mishra testified that the "kick-off" meeting that was supposed to take place on December 19, 2016 never took place and explained that when he saw the email on December 15, 2016 stating that the company had been registered using his passport, he called Dettogne and told him that he did not want to be part of the company. [*Id.* at 22-23.] Mishra testified that Dettogne told him that the company was never registered, which is why he cancelled his trip to the United States. [*Id.*]

Mishra went on to testify, however, the Xiaoming came to the United States on December 18, 2016, but not for anything involving the Prime Project. [*Id.* at 24.] Yet the two met at Mishra's counsel's office during Xiaoming's visit to take care of some legal issues with Xiaoming's business. [*Id.* at 25.] On cross-examination, Mishra admitted that he brought three gentlemen including Wang and Xiaoming to his Magnesita office on December 20, 2016, explaining that they needed to check out of their hotel and needed some place to store their luggage. [*Id.* at 40-41.] He testified that Wang left to go shopping, but Mishra took Xiaoming and the other gentleman, Brian Guo, to

Mishra's counsel's office. [*Id.* at 41.] From Mishra's counsel's office, Mishra, Xiaoming, and Guo left to pick up Wang and the four gentlemen drove to Chicago. [*Id.* at 41-42.]

I find Mishra's testimony far from persuasive. He admitted that as an employee of Magnesita, he had confidential and trade secret-type information available to him. [*Id.* at 27.] He also admitted that he was aware that the new company being formed by Dettogne was potentially competitive with Magnesita, which Mishra seemed excited about until, allegedly, he learned that it was registered under his name. I also find it concerning that, despite the fact that Dettogne cancelled his trip to the United States, Wang and Xiaoming did not and met not only with Mishra, but, at least in the case of Xiaoming, with Mishra's attorney. While Mishra claims that he just wanted to help Dettogne and his daughter stay in Dubai, that does not blind me to the fact that the mechanism by which he was doing so was a potential competitor with Magnesita with which Mishra was able to share Magnesita's trade secrets. And while Mishra repeatedly testified that Prime Project was never a registered company and, to him, was "just an imagination," that is not enough to assuage my concerns. [*Id.* at 38.] My decision at this point is, of course, preliminary. Ultimately, it will be up to a jury to decide whether Mishra's actions were entirely harmless or whether he was in fact scheming against his employer.

As a final matter, at the February 1, 2016 hearing on Mishra's motion, Mishra's counsel requested that either Magnesita or the Special Master post bond if Mishra's laptop is to be imaged because of the risk that some of his personal information such as

his bank account information and credit card information may fall into the wrong hands because the device on which the image of his laptop is stored is at some point connected to the Internet. [DE 47 at 51.] Specifically, he requested a bond for Mishra's entire financial identity. [*Id.*] I denied his request. First of all, Mishra's counsel cited no support for his request for bond in these circumstances. Secondly, his concern is somewhat unreasonable given that the Special Master is operating at the Court's discretion and working on a closed system, which poses a much lower risk of this type of exposure than Mishra's everyday online activities on his laptop. Finally, while Rule 65(c) contemplates payment of a security, it does not encompass the protection that Mishra's counsel requested. Rule 65(c) states that a TRO may only be issued "if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Here, Mishra suffers no costs or damages if it is found that his laptop was improperly seized or imaged. Mishra's laptop will be returned to him as soon as it is imaged, and the delay in its return has been caused by Mishra's repeated challenges to the imaging of the laptop. Furthermore, if it is found that Mishra's laptop was improperly seized or imaged, the Special Master will be ordered to destroy the image of Mishra's laptop.

ACCORDINGLY, for the reasons stated on the record and in this Opinion, Defendant Surendra Mishra's Rule 65(b)(4) Motion to Dissolve *Ex Parte* Temporary Restraining Order and for an Immediate Hearing, DE 39, is **DENIED**.

**SO ORDERED**.

ENTERED: February 17, 2017

 s/ Philip P. Simon
**PHILIP P. SIMON, JUDGE**
**UNITED STATES DISTRICT COURT**