| | | |
|---|---|---|
| MAGNESITA REFRACTORIES COMPANY, | ) ) ) | |
| Plaintiff/Counter-Defendant, | ) ) | Case No. 2:16-cv-524-PPS-JEM |
| v. | ) ) | |
| SURENDRA MISHRA, | ) ) | |
| Defendant/Counter-claimant. | ) ) | |

## OPINION AND ORDER

Global conglomerates poaching employees from each other, hiring them to attack their competitors or as revenge; executives crisscrossing the globe, forming secret entities and holding covert meetings in far flung places like Dubai and the Courtyard by Marriott in Hammond, Indiana; private investigators conducting undercover surveillance; and dishonest employees allegedly engaging in corporate espionage and flouting court orders. Is this the promotion for a new mass market thriller? No, evidently it's just another few weeks in the fiercely competitive world of refractory production and sales. Or so the documents in this lawsuit involving the tumultuous firing of a high-ranking executive suggest.

On one hand, Magnesita Refractories Company has sued its former Global Vice President for Key Accounts, Surendra Mishra, for breach of fiduciary duty and theft of trade secrets after it discovered he was allegedly stepping out on them and looking to form a new business that would compete with Magnesita. On the other hand, Mishra

claims that he was fired in bad faith by Magnesita without cause and on trumped up allegations to avoid paying him a large severance under his contract; Mishra has countersued for over a million dollars he says he is owed.

Presently before me are cross-motions for summary judgment [DE 109 and 111]. The warring factions each seek judgment as to the claims they have filed against one another, in the hopes that I can resolve this dispute without a trial. But because the parties present diametrically opposed interpretations of the same events and documents, disputed issues of material fact remain, and a trial is necessary on many of the claims. That said, at least some of the claims fail as a matter of law because even after extensive discovery, certain elements cannot be proven, and thus those claims cannot proceed to trial.

## Background

Let's start with the facts. And although the parties agree to some basic aspects of the time line of events, they tell vastly different stories about what transpired in late 2016 that gave rise to this lawsuit. I've done my best to cobble together a cohesive narrative, noting where the stories diverge and where the parties' interpretations of the same events vary.

### Mishra's Employment by Magnesita from 2014 to 2016

Beginning in the year 2000, Mishra worked at another refractory company, an Austrian company known as RHI. A refractory is a heat-resistant material, usually a mineral or combination of them, commonly used in heavy duty industries like the iron

and steel industry for furnaces, kilns, incinerators and reactors. *See* Wikipedia, "Refractory", https://en.wikipedia.org/wiki/Refractory (last accessed on December 7, 2018). In early 2014, after apparently multiple overtures, Mishra jumped ship from RHI and joined its competitor Magnesita. On February 17, 2014 he signed an Employment Agreement with Magnesita. His job title throughout his tenure was Global Vice President of Key Accounts.

In addition to Mishra, around the same time in 2014, Magnesita recruited fourteen other employees from RHI. [DE 116-12, Dep. of O. Levy at 31.] Mishra led this team and testified that his primary role was to "attack" RHI and increase Magnesita's sale of refractories to a key customer — ArcelorMittal SA, a Luxembourg-based steel manufacturer with a huge presence in East Chicago, Indiana. According to Magnesita's Chief Operating Officer, the poaching of RHI's marketing department was "payback" for a prior incident in which RHI hired approximately 100 individuals from Magnesita in Brazil.

From 2014 to 2016, by all accounts, Mishra did a bang up job for Magnesita. The company increased its global sales to ArcelorMittal during this period from $65,000,000 to $106,000,000. According to Mishra, the bulk of his growth came from taking market share from RHI. Thus, it seems, Mishra fulfilled his role to attack his former employer for Magnesita's benefit.

**Magnesita's Employment Agreement with Mishra**

When he joined the company as a vice president, Mishra signed an Employment Agreement with Magnesita. [DE 114-1, Employment Agreement.] Under the agreement, not surprisingly, Magnesita is defined as the Employer and Mishra as the Employee. While there were many terms to the Employment Agreement, I will set out the most salient ones below.

First, there are provisions requiring Mishra to keep Magnesita's confidential information, well, confidential. The list of possible information and things to which the duty applies to is expansive, including all of Magnesita's:

> inventions, formulas, technical developments and methods, whether or not patentable or reduced to practice; products or services; "know-how"; research initiatives, reports, designs, photographs, plans, projects, processes, technology and technical configurations; manufacturing or testing methods, operations or equipment; fees, costs and pricing structures; mailing lists; lists of existing or prospective clients or contracts, customers, vendors, referrals and all other data related thereto; the identity of customers; customer rates and schedules; customer preferences; techniques of doing business; financial and profit information; marketing strategies and information; competitive information; advertising; budgeting and compensation information; accounting and business methods; analyses; reports; manuals; computer software, including operating systems, source and object codes, applications, program listings and flow charts; databases; trademarks and brand names under development and information relating thereto; trade secrets; the existence or terms of any contracts or potential contracts; personal or personnel information not accessible by the public and, in particular, not known to competitors of Employer, any information, material or documents that Employer identifies or treats as confidential or with respect to which are subject to confidentiality obligations owed to third parties, in all cases whether or not recorded in a

document, disk, computer tape or other device or means of storing or recording data; and materials or information embodying or developed by use of any such Confidential Information.

[DE 114-1.]

Second, the Employment Agreement contains non-compete provisions.

Specifically, Section 9 of the Employment Agreement provides:

> To protect Employer's Confidential Information and goodwill, Employee agrees that while employed by Employer and during the Post-Employment Restricted Period (as defined below), Employee shall not, directly or indirectly:
> [...]
> b. solicit, divert, take away or attempt to take away any customer or prospective customer Employee solicited or serviced, or for which Employee had direct responsibility or indirect responsibility (e.g., supervised an employee who serviced or solicited the customer or prospective customer), at any time during the twelve (12) months preceding Employee's termination; or
>
> c. solicit or induce for any Competing Business the employment or retention of any person who was within the twelve (12) months preceding Employee's termination employed by Employer; or
>
> d. attempt to persuade any employee, contractor, customer or vendor to terminate his, her or its relationship with Employer or do any act that may impair the relationship between Employer on the one hand, and the employees, contractors, customers and vendors of Employer on the other hand.

[*Id.*]

Third, the Employment Agreement, which does not guarantee employment for any set number of years, and was thus terminable "at will," contains a provision which

requires the payment of certain severance benefits to Mishra if he is terminated without cause. Cause is defined under the Employment Agreement to mean:

> Employer's good faith determination of Employee's (i) willful failure or refusal to satisfactorily perform his duties or obligations in connection with his current position, (ii) having engaged in willful misconduct or gross negligence, or Employee's material breach of this Agreement or of any Employer policy…

[*Id.*] But if Mishra is fired for cause, no such payments are due. [*Id.* at § 10.]

Fourth and finally, incorporated within the Employment Agreement was an obligation to abide by Magnesita's Code of Ethics. [*Id.* ("Employee acknowledges receipt of, and agrees to comply with, Employer's Code of Ethics.").] While the Code of Ethics is lengthy, the relevant provisions relating to Mishra's obligations not to have conflicts of interest with or compete against Magnesita are:

> 5.1 Conflicts of interest can rise when an individual's personal or financial private interest improperly interferes with the interest of the company, or influences the judgment or actions of Collaborators' or representatives in the performance of their functions and duties.
>
> 5.2 Collaborators and manager may not establish shareholding or commercial relations, personally or through family members, with business partners, service providers, suppliers, or competitors of Magnesita without due authorization from the Ethics Committee.
>
> 5.3 Collaborators are not allowed to perform others activities competing to the time they must dedicate for MAGNESITA.

[DE 114-5, Code of Ethics at 8.]

Based on the events discussed below, these are the terms of the agreement that Magnesita tells me Mishra breached. According to Magnesita, it is those breaches of the agreement that gave it the right to terminate Mishra's employment.

**Magnesita Announces its Merger with Mishra's Former Employer**

On October 5, 2016, after nearly two years of success, things changed between Mishra and Magnesita. That day, after several months of rumors, Magnesita announced that it was intending to merge with another refractory company. That company was none other than Mishra's former employer, RHI.

While the merger did not end up closing for another year, the news immediately caused Mishra concern. As he testified at his deposition, Mishra was "disturbed" by this development because his "sole task" at Magnesita "was to attack RHI," and he had been successful at it, taking almost $40 million in business from them. [DE 116-1, Dep. of S. Mishra at 38.] As he saw it, his "role as a key person attacking RHI was in jeopardy because there was no reason to compete with RHI anymore." [*Id.*] On top of that, he felt that RHI, "a very acquisitive company," had a history of treating former employees who left RHI for a competitor prior to a merger poorly. [*Id.* at 39.] Mishra had conversations with his bosses at Magnesita regarding his concerns over his future and in those meetings discussed with them terms of his Employment Agreement, including the provision that he be paid severance if he was terminated without cause. [*Id.* at 39-40.] During those meetings, no one told Mishra that he wouldn't have a job after the merger, but his suspicions and anxieties remained.

## Events Surrounding the Alleged Conspiracy

At this point, the parties' stories begin to diverge considerably and their characterization of the next two months are in stark contrast with one another. In summary, Magnesita's view is that upon learning of the merger, Mishra decided he was going to compete against his current employer. Magnesita says that he began to spearhead a conspiracy to create a new company to compete with Magnesita (and RHI for that matter) and misappropriated Magnesita's trade secrets to boot.

Mishra tells a different story. He says that while some of his friends in the industry reached out to him to discuss their mutual business and someone floated the idea of a new company, there was nothing more to it than chatter. And to the extent that one individual put together a PowerPoint presentation which contained a skeleton sketch of a new business and indicated an ownership interest for Mishra, Mishra says he had no involvement in its formation and Mishra took no active steps to form a competing business venture. Likewise, Mishra tells me that there is no evidence that any trade secrets were misappropriated or disclosed during this time.

Here are the specifics of the competing version of events: In late October 2016, a few weeks after the merger was announced and while Mishra was in Dubai on business (in between vacation time in India), he and a guy named Zelbner Dettogne had dinner together. Dettogne was Magnesita's Director of Sales for the Middle East, and he was based in Dubai. The main topic of conversation at that dinner it seems was the impending Magnesita/RHI merger. That doesn't sound particularly surprising.

Dettogne, like Mishra, had concerns as to whether his position would remain post-merger, given that RHI already had a strong presence in the Middle East and India. Dettogne feared that his position could become redundant. According to Mishra, Dettogne wanted to remain in Dubai because his family was there, and he needed to make sure he had employment in Dubai because his residency in the country was predicated on his employment. Mishra and Dettogne discussed the possibility that in the event Dettogne was terminated, Dettogne could form a new company based in Dubai. Magnesita has a different take on the meeting. They tell me that this meeting was where Mishra and Dettogne began to plot to form their competing company, *together*.

There was another meeting that took place in Dubai on Mishra's visit there. Mishra met with Wang Yong, the owner of ACIS Beijing, a company and business partner of Magnesita that sells Magnesita's products. But again, the parties dispute the significance of that meeting. Mishra telling me it was an entirely innocent — a quick "hello" with a supplier who happened to be in the same city as Mishra. Magnesita, on the other hand, sees it as another step in the growing conspiracy against it.

The next development in the alleged formation of a company to compete with Magnesita was a November 21, 2016 email from Dettogne to Yong and Mishra. Magnesita notes that Dettogne sent this email to Mishra's personal email address, as opposed to his Magnesita email address which was typically used for Magnesita related business. To Magnesita, this is evidence of Mishra's intent to avoid detection. How the

receipt of an email is evidence of *Mishra's* intent is obscure to me. In any event, in this email, addressed to Yong, Dettogne stated that "as aligned with Mr. Surendra (Mishra), the kick-off meeting for the PRIME PROJECT is confirmed in Chicago" for December 19, 2016 and would include Yong, Mishra, Dettogne as well as Fan Xiaoming, who owned Xingrong, another one of Magnesita's business partners. The email included a meeting agenda of the following:

> \* Discussion of the business plan;
> \* Presentation of the market intelligence and market strategies;
> \* Alignment of the business model between Produce and Prime Refractories;
> \* Sales and technical training in refractories
> \* Discussion of structure (Agents, distribuidor [sic]) in the main region in order to move very aggressively in the market;
> \* Next steps and priorities;
> \* ETC,

[DE 112-2 at 38.] Dettogne closed the email by asking Mishra to add additional meeting items and to circulate a "final agenda according to your vision." Mishra responded to the email, acknowledged its receipt , and stated he would "warmly welcome" both Dettogne and Yong to the meeting in Chicago. But he did not circulate any updated agenda or contribute to the substance of the development of Prime in these emails.

Sometime thereafter, Dettogne sent Mishra a PowerPoint presentation, containing Dettogne's "conception" of a new company called Prime Refractories or Prime (or possibly another name). The PowerPoint contains a rough sketch of a new refractory company whose "Vision" is to "Be the differentieted [sic] Refractories Company to provide profitable solution worldwide, leveraging and enhancing the

results of our customers." [DE 116-8.] The PowerPoint contains market share information concerning the leading refractory companies in the world (e.g., Magnesita, RHI, and others), as well as market share by customer category (*e.g.*, glass, cement, steel, and nonferrous metals). On a slide titled "Company Ownership" the company's ownership is broken into three individuals, Wang Yong, "S" and "Z." Magnesita tells me, and Mishra guesses it to be the case, that the S refers to Mishra's first name (Surendra) and the Z refers to Dettogne's (Zelber). [*Id.*]

The implications of this PowerPoint are clear to Magnesita: it shows that Mishra and his cohort were actively planning a business venture to compete against Magnesita. But Mishra has submitted sworn testimony that he did not prepare this PowerPoint, provide any content for it, or ever owned or accepted employment with "Prime" or any of the other entities referenced in the PowerPoint. [DE 114-3, S. Mishra Aff. ¶ 9.] Mishra tells me that after he received this PowerPoint from Dettogne, he reached out to him and explained that he "never intended to be involved in the new venture" and "assumed Dettogne alone would form a new business designed to establish Dettogne's residency in Dubai." [*Id.*] Mishra says that after he made that clear, Dettogne did not come to the December 20 meeting in Chicago discussed below and that this is evidence he was not trying to compete with Magnesita. [*Id.*]

The next vignette in the story is a December 15, 2016 email from Yong to Mishra, copying Dettogne's Magnesita work email. As discussed below, it was this December 15, 2016 email which alerted Magnesita as to Mishra and Dettogne's activities as to

Prime. In this email, Yong states that he had "just finished company registration" in JAFZA (the Jebel Ali Free Zone, a free enterprise zone in the emirate of Dubai) using a copy of Mishra's passport. Yong also confirmed that he would be traveling to Chicago in a few days for the previously discussed meeting with Fan, Dettogne and Mishra. [DE 112-2 at 31.]

Again, while on its face these seem to be concrete steps towards formation of a competing enterprise by one of the co-conspirators, Mishra offers a different explanation. He says that such a registration in his name would be impossible (and Magnesita knew as much) and that he does not know what Yong meant by these statements. [DE 114-3 at ¶ 10.]

**Magnesita Investigates in Advance of the December 20 Meeting**

As part of an investigation apparently (and at least initially) unrelated to Mishra or the substantive allegations of this lawsuit, Magnesita investigated and suspended Dettogne shortly before discovering the Prime conspiracy. Dettogne was suspended on December 4, 2016. During the suspension, Magnesita's Vice President of Sales & Marketing Gustavo Franco had Dettogne's emails forwarded to him so that the company could continue any business operations Dettogne was responsible for without interruption. [DE 112-9, Dep. of G. Franco at 117-18.] Dettogne's employment with Magnesita was terminated effective December 18, 2016, or shortly after Franco intercepted the above-mentioned email dated December 15, 2016 from Wong to Mishra and Dettogne.

The December 15 email implicated Mishra in the Prime conspiracy, and Magnesita acted on its suspicions. It began to review the internal computer records and emails amongst Mishra, Dettogne and Yong. [*Id.* at 76-77.] The company, alerted to the fact that a meeting between the seeming conspirators was to take place near their headquarters, hired a private investigator to tail Mishra on December 19 and 20. In addition, it applied for and was granted an *ex parte* Temporary Restraining Order [DE 10] from this court which, among other things, authorized the seizure Mishra's personal laptop which he had used for work (with Magnesita's permission). Since this was a personal laptop, there were obvious privacy concerns at play. So the TRO attempted to strike a balance; it allowed the seizure of the laptop so that any evidence could be secured but it specifically precluded Magnesita from reviewing the contents of the laptop. Instead, once the laptop was seized, Magnesita was instructed to deliver it to the custody of the Clerk of Court so that a hearing could later be held with all parties present. [*Id.*]

### The December 20 Meeting and Mishra's Employment Termination

On December 20 there was a meeting planned between Mishra, Dettogne, Yong and Fan. Mishra says that this meeting, scheduled to take place at the Courtyard by Marriott hotel in Hammond, Indiana, never took place. [DE 114-3 at ¶ 11.] Tellingly, Magnesita does not offer any evidence contradicting Mishra's statement that this particular meeting never actually took place. Instead, Magnesita says that on December 20, some of the cohorts met with other Magnesita employees (who do not appear to be

implicated in the alleged conspiracy) at Magnesita's offices, but there is no indication that the new company "Prime "was discussed at these meetings. Indeed, there is no evidence indicating that any further developments relating to Prime took place on either December 19 or 20.

The parties agree that later that day, when Mishra went to meet Yong at his hotel for dinner, Magnesita's Vice President, Gustavo Franco, and the private investigator Magnesita hired were waiting for him. They took Mishra aside and began to question him as to his activities relating to Prime. Mishra denied forming a competing business. Franco presented Mishra with the TRO I had issued and demanded that Mishra turn over his personal laptop for inspection. Mishra attempted to contact his attorney, was unable to reach him, and refused to turn over his laptop to Franco and Magnesita. At the conclusion of the meeting, Mishra was informed that he was suspended from Magnesita effective immediately. Magnesita says that Mishra lied to Franco and the investigator that day but Mishra categorically denies this. Mishra admits to disobeying the court's order but says the reason he did not immediately hand over his personal laptop was because he feared Magnesita would plant information on it to make it seem as if he had stolen trade secrets.

On December 22, I held a hearing on an Order to Show Cause based upon Mishra's refusal to hand over his laptop. During that hearing, Mishra surrendered the laptop. I later appointed a Special Master, a computer forensic specialist, who extracted all of the data from the laptop for safekeeping and for use in discovery in this case. This

was done in part to protect any of Mishra's personal and confidential information, unrelated to Magnesita, that may have been contained on the laptop. [DE 15, 38.]

On January 11, 2017, Mishra's employment with Magnesita was formally terminated. In the termination letter, Magnesita listed several reasons why it was firing Mishra. First, the letter stated that "during [the December 20] interview you made multiple false statements to Magnesita's investigator and counsel." [DE 116-5 at Exhibit B, Termination Letter.] Curiously, what specific false statements were made during the investigation is not contained within the letter. Second, the letter states that cause for termination existed under the Employment Agreement because Mishra failed to turn over his laptop "after confirming it contained Magnesita's documents" and in violation of this court's TRO. [*Id.*] Finally, it stated that Mishra's "interactions with Zelber Dettogne and Magnesita's business partners and suppliers constitute serious violations of Sections 5.1, 5.2 and 5.3" of the Magnesita Code of Ethics. [*Id.*]

## Discussion

Federal Rule of Civil Procedure 56 governs a motion for summary judgment. Summary judgment will be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To prevail, a party can either point to undisputed facts supported by evidence or point to an absence of evidence as to some element of the other party's claim or affirmative defense. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (holding that summary judgment is appropriate "against a party who fails to

make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial").

When deciding a motion for summary judgment, I must review the evidence presented and construe all facts and draw all inferences from those facts "in the light most favorable to the non-moving party." *Zuppardi v. Wal-Mart Stores, Inc.*, 770 F.3d 644, 649 (7th Cir. 2014). In order for the non-moving party to prevail, "all that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *First Nat. Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288–89 (1968). Summary judgment should be denied "where there is reason to believe that the better course would be to proceed to a full trial." *Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986).

There is a lot to unpack in this case. Specifically, there are five different claims to be discussed in the dueling summary judgment motions. I take up each of them below. But as discussed below, most of the unpacking is going to have to be done by a jury. There are simply too many questions of fact on most of the claims, and this precludes summary judgment on those claims.

## I.    Claim for Breach of Contract and Declaratory Judgment

The principal issue in this lawsuit is whether either of the parties breached the Employment Agreement in the events surrounding Mishra's termination in January 2017. Count VI of Magnesita's Amended Complaint seeks a declaratory judgment pursuant to Ind. Code § 34-14-1-2 that Mishra was terminated for "cause" after a good

faith determination by Magnesita that he engaged in a "willful failure or refusal to satisfactorily perform his duties or obligations in connection with his position and for having engaged in willful misconduct, gross negligence." [DE 35, Amended Complaint at ¶ 124.] Thus, Magnesita says it owes Mishra nothing in terms of "Post-Employment Payments" as defined in Section 10 of the Employment Agreement. Mishra counterclaims for breach of contract and wrongful termination and says that Magnesita's determination was not in good faith and that consequently it is in breach. These are mirror-image claims of one another, but only Magnesita has affirmatively moved for summary judgment.

"Generally, construction of a written contract is a question of law for which summary judgment is particularly appropriate." *Manzon v. Stant Corp.*, 202 F. Supp. 2d 851, 856 (S.D. Ind. 2002) (citation omitted). But here, the question of whether there was a breach or not depends on whether Mishra's termination was made in good faith. Questions of good faith should generally be left for the trier of fact because they concern a party's state of mind. *See Market Street Associates v. Frey*, 941 F.2d 588, 597 (7th Cir. 1991); *Craft v. Economy Fire & Cas.*, 572 F.2d 565, 573 (7th Cir. 1978) ("cases in which the underlying issue is one of motivation, intent, or some other subjective fact are particularly inappropriate for summary judgment...."). Indiana law recognizes that when questions of good faith arise in the context of employment termination, summary judgment should not be granted. *See Weiser v. Godby Bros.*, 659 N.E.2d 237, 240 (Ind. Ct. App. 1995) ("[W]hether Godby failed to act in good faith or deal fairly with Weiser are

-17-

questions of fact which should be decided by the trier of fact."); *DeCalonne v. G.I. Consultants, Inc.*, 197 F. Supp. 2d 1126, 1137 (N.D. Ind. 2002) (denying summary judgment on breach of contract claim in employment termination case when questions of fact as to whether "for cause" standard had been met existed). This is true even though neither party asserts any patent or latent ambiguity in the terms of the Employment Agreement.

To analyze whether Magnesita is entitled to summary judgment on its declaratory judgment claim for having terminated Mishra for cause, I will focus on the reasons listed in the employment termination letter signed by Magnesita's Vice President for Sales & Marketing, Gustavo Franco, and dated January 11, 2017. First, the letter stated that "during [the December 20, 2016] interview you made multiple false statements to Magnesita's investigator and counsel." [DE 116-5 at Exhibit B.] Undoubtedly if this is true, and concerned the subject of Mishra's activities regarding Prime and his employment with Magnesita, there would probably be cause for termination. The problem is, Magnesita has not stated what false statements were made. When asked at his deposition for a list of the false statements made, Franco responded "I don't remember." [DE 114-7, Dep. of G. Franco at 114.] Nor has Magnesita put forth evidence (such as interrogatory responses or a declaration from the private investigator who was present) which illustrates what alleged lies Mishra told. I cannot evaluate whether the conclusion in the letter that Mishra made false statements was made in

good faith if I don't even know what false statements were alleged to have been made. Thus Magnesita cannot be entitled to summary judgment on this basis.

Second, the letter states that cause under the Employment Agreement was shown when Mishra failed to turn over his laptop "after confirming it contained Magnesita's documents" and in violation of this court's TRO. [DE 116-5 at Exhibit B.] For starters, this was Mishra's *personal laptop*. Mishra tells me that Magnesita knew he used his personal laptop to conduct Magnesita-related business. The company doesn't deny this and it seems entirely plausible and consistent with the fact Mishra appears to have traveled frequently for work and had no company-issued laptop. Thus the mere presence of Magnesita documents on the computer would not seem to be a basis for willful misconduct or gross negligence as a matter of undisputed fact. Accordingly, it wouldn't satisfy the requirements of cause under the Employment Agreement.

The question then is whether or not Mishra's refusal to immediately comply with the TRO I issued was sufficient grounds — in the language of the employment agreement – to constitute "willful misconduct or gross negligence." [DE 114-1.] This is a more difficult question. Even if it was obtained ex parte, the TRO was mandatory and Mishra was bound to comply with it. I do not take lightly a party disobeying my written orders. But Mishra offers enough of a plausible story that I cannot with confidence say that as a matter of law his failure to surrender the computer on December 20, 2016 was grounds to terminate his employment on January 11, 2017. Recall that Mishra was confronted by his boss at a hotel after business hours. He was

undoubtedly shaken by the events, and as a lay person, he sought the advice of his counsel.  He was also concerned about Magnesita doing something untoward with his laptop. And he did turn over the laptop two days later, on December 22, 2016, in open court after he had the opportunity to speak to a lawyer.  Based on those events, I extinguished the Order to Show Cause against him. [DE 15.] In sum, whether his actions of December 20, 2016 were entirely reasonable on the one hand, or were "willful misconduct or gross negligence" on the other, will have to be sorted out by a jury.

The final justification of for cause termination listed in the letter were Mishra's "interactions with Zelber Dettogne and Magnesita's business partners and suppliers constitute serious violations of Sections 5.1, 5.2 and 5.3" of the Magnesita Code of Ethics. [DE 116-5 at Exhibit B.] Those Code of Ethics provisions include prohibitions on conflicts of interest which interfere with Magnesita's interests or negatively influence the employee's performance of their duties to Magnesita; prohibitions against "shareholding or commercial relations" with "business partners, service providers, suppliers, or competitors of Magnesita without due authorization from the Ethics Committee"; and a requirement that employees "are not allowed to perform others [sic] activities competing to [sic] the time they must dedicate to Magnesita." [DE 114-5.]

In analyzing this basis for the termination, I'm required to once again view the evidence in the light most favorable to Mishra. In doing so I must hew closely to the unambiguous terms contained within the Employment Agreement and the Code of Ethics to determine whether Magnesita is entitled to summary judgment on these facts.

Magnesita claims that Mishra violated each of these provisions by attempting to start Prime to compete with Magnesita in conjunction with Dettogne and Magnesita's other business partners and failing to alert Magnesita's Ethics Committee of his involvement or the existence of Prime.

Mishra's rejoinder is that Prime never got off the ground and so he had no conflict of interest and did not establish a "shareholding or commercial relationship" which required prior authorization. It is undisputed that Mishra did not own an interest in a competing company, as no such company actually ever existed. True, there was the reference in the email to using a copy of Mishra's passport to register a company within the United Arab Emirates, but beyond this statement (which Mishra says is facially implausible), there is no evidence the company actually existed. Thus he had no "shareholding" interest in a competing company and so that prong of the Code of Ethics does not seem to be capable of resolving this issue in Magnesita's favor as a matter of undisputed fact.

Concerning the relationship prong of the Code of Ethic's prohibition, it seems salient that the other conspirators in the alleged Prime conspiracy were all pre-existing suppliers which Mishra regularly did business with on Magnesita's behalf. Of course if Mishra were to use those preexisting contacts for his own personal gain and against Magnesita, then he violated the Code of Ethics, but as it stands, the evidence is not there to support this proposition as a matter of undisputed fact. It seems more so that Magnesita wants me to read the Code of Ethics provisions as imposing a strict duty to

notify it and its Ethics Committee of any *possible* or *potential* conflict of interest that would ever arise. But such an absolute "duty to notify"of potential conflicts is not contained within the four corners of either the Employment Agreement or the Code of Ethics. Under the circumstances I cannot rewrite the documents to supply terms which the parties themselves did not bargain for. *Product Action Inter., Inc. v. Mero*, 277 F. Supp.2d 919, 925 (S.D. Ind. 2004) ("The court does not have the authority to rewrite the parties' contract."); *Piskorowski v. Shell Oil Co.*, 403 N.E.2d 838, 846 (Ind. Ct. App. 1980) ("It is not the province of the courts to rewrite contracts for parties[.]"); Williston on Contracts § 31:5 (4th ed.) ("[T]he court must enforce it as drafted by the parties, according to the terms employed, and may not make a new contract for the parties or rewrite their contract while purporting to interpret or construe it.").

Lastly, there is the PowerPoint presentation which Magnesita says contains its confidential business information and makes clear Prime was designed to compete against Magnesita. As Mishra notes, Magnesita did not know about the PowerPoint until months after his employment was terminated. And as discussed, the PowerPoint was created by Dettogne (another employee of Magnesita at the time it was put together), *not* Mishra. Such an after-the-fact justification for terminating his employment cannot have been part of the good faith determination then at the time it was made. Magnesita suggests that Mishra's activities were improper because he did not alert anyone at Magnesita to them, but I have found that Magnesita's attempts to

read a duty to notify of possible conflicts into the Code of Ethics to go beyond the obligations strictly imposed by the documents.

Nothing in *Bearden v. Humana Health Plan, Inc.*, a case relied on by Magnesita, requires a different result. In that case, termination was for performance related reasons, *i.e.*, the employee's "failure to meet Humana's standard of patient care, his failure to improve while on probation, and his unavailability while on call." 1992 WL 245604, at *3 (N.D. Ill. Sept. 23, 1992). The employment agreement there likewise gave Humana the right to terminate the employment "whenever, in the sole discretion of the Medical Director of Health Plan, [the employee] fails to satisfactorily perform his contractual duties." *Id.* Here, it seems both parties agree that Mishra performed well at his job and continued to do so up until he was suspended and Magnesita later made the determination to fire. Mishra's Employment Agreement likewise contains the additional requirement that any for cause determination be made in good faith, which at a minimum requires objective truth as the foundation for the stated reasons. *See Kohler v. Leslie Hindman, Inc.*, 80 F.3d 1181, 1187 (7th Cir. 1996) (noting that agreement containing "sole discretion" connotes greater subjectivity than may ordinarily exist in other good faith determinations); *see also Tymshare, Inc. v. Covell*, 727 F.2d 1145, 1153 (D.C. Cir. 1984) (holding that while "it is possible to so draw a contract as to leave decisions absolutely to the uncontrolled discretion of one of the parties and in such a case the issue of good faith is irrelevant" such contractual language must be explicit) (Scalia, J.) (internal citation omitted).

At bottom, whether Mishra's activities vis-a-vis Prime were sufficient to rise to the level of an actual conflict of interest sufficient to warrant termination for cause and made in good faith strikes me as a factual question that I cannot answer at this stage. As such, I will deny the motion for summary judgment as to Count VI.

## II.     Mishra's Counterclaim under the Indiana Wage Payment Statute

Indiana, like most states, has a statutory regime governing the payment of wages. This statute mandates the conditions under which employers must pay their "wages" to their employees, a specific type of remuneration under the law. Mishra has claimed two types of wages that he is allegedly due: severance pay and variable compensation. Magnesita tells me that "[a]s a matter of law, severance pay is not wages subject to the Indiana Wage Payment Statute." [DE 113 at 22.] In support of this argument, it cites two cases, *Wank v. Saint Francis College*, 740 N.E.2d 908 (Ind. Ct. App. 2000) and *Baesler's Super-Value v. Indiana Comm'r of Labor ex rel. Bender*, 500 N.E.2d 243 (Ind. Ct. App. 1986). A review of these cases, however, makes clear that no such categorical rule bars the recovery of either severance or variable compensation. Thus, a deeper dive into the law is required.

"Indiana courts have interpreted Indiana Code Section 22–2–5–1 to create three regulations: " '(1) [employees'] wages must be paid in money; (2) if requested, employers must pay employees semi-monthly or bi-weekly; and (3) employees, upon separation from employment, must be paid the amount due them at their next and usual payday (unless their whereabouts are unknown).'" *Wank*, 740 N.E.2d at 911

(citation omitted). "The Wage Payment Statute does not provide a definition of 'wages' as the term is used in those provisions." *Id.* at 912. And without any such definition, courts "consider the substance of the compensation to determine whether it is a wage, and therefore subject to the statute" as opposed to a bonus or other type of compensation "which is outside the statute."*Id.* "To qualify as a wage, the compensation must be connected to the work performed by the employee." *Id.*

For example, in *Die & Mold, Inc. v. Western*, 448 N.E.2d 44, 46–47 (Ind. Ct. App. 1983), the Indiana Court of Appeals held that an employment agreement entered into prior to performing services which gave vacation pay based upon length of service and time worked was compensation because "when the services are rendered, the right to receive the promised compensation is vested...." Other courts have likewise found that commissions are wages, *Licocci v. Cardinal Assocs., Inc.*, 492 N.E.2d 48, 55 (Ind. Ct. App. 1986), and compensation that was re-allocated by agreement from insurance premiums to a retirement savings plan was deferred payment and therefore wages. *Johnson v. Wiley*, 613 N.E.2d 446, 450 (Ind. Ct. App. 1993).

Concerning severance pay, the Employment Agreement between Mishra and Magnesita, as discussed at length above, mandated the payment of severance pay, unless Mishra was fired for cause, *i.e.*, if he performed his job satisfactorily but was nonetheless fired, the money was his. That makes it different than the severance package at issue in *Wank* which "was limited to those employees terminated because of the merger" and thus "was a discretionary, gratuitous benefit offered to employees as

an act of benevolence." *Wank*, 740 N.E.2d at 913. Mishra's severance was a bargained-for

contractual benefit that he obtained as a result of leaving one company to join its

competitor, Magnesita.

Likewise, the other case Magnesita cites, *Baesler's Super-Valu*, did not hold that

severance pay was definitionally not wages, but instead found that the issue need not

be addressed because the contract issue allowed for *either* one week's notice or one

week's severance pay, and the court expressly did not address the applicability of the

Wage Payment Statute. 500 N.E.2d at 247, n.1 ("[W]e believe it is not necessary for us to

consider the applicability of I.C. 22–2–5–1 to severance pay at this time."). Thus I cannot

rule that Mishra's severance pay be categorically excluded from the definition of

"wages." Summary judgment on this part of the claim is therefore not appropriate.

Mishra's claim for variable compensation, however, is different. The variable

compensation is akin to a bonus, something payable on a certain date, if certain

conditions are met. Bonuses are "outside the statute." *Wank*, 740 N.E. at 912. Under the

Employment Agreement, variable compensation is "awarded in the sole discretion of

Employer, based on individual and company performance during the calendar year"

and "[r]eceipt of variable compensation for any one year will not entitle Employee to

receipt of variable compensation in any subsequent year." [DE 114-1.] Furthermore,

"[t]he variable compensation program may be amended or terminated at any time at

Employer's sole discretion." [*Id.*] Finally, one of the conditions is that an employee

"must remained employed by Employer on the date variable compensation is paid in

order to earn a variable compensation award for the preceding calendar year." [*Id.*] It is undisputed that Mishra was not employed in 2017 when his variable compensation would have potentially been paid.

Mishra's only response is that under Indiana law, a non-breaching party has a choice of remedies for a breach of contract. But this claim is based on a supposed violation of the Indiana Wage Statute; it's not a contract claim, and so this argument misses the mark. Magnesita is therefore entitled to summary judgment on Mishra's claim for variable compensation under the Indiana Wage Payment Statute, but the question of severance pay must be decided by the jury.

### III. Mishra's Counterclaim for Conversion of His Unvested 401(k)

In Count III of his Counterclaim, Mishra seeks to recover portions of his unvested 401(k) which he claims that Magnesita unlawfully converted. At the time his employment was terminated, Mishra had a vested balance of $125,830.29 and an unvested balance of $29,785.76 in his 401(k) accounts administered by T. Rowe Price on behalf of Magnesita. [DE 112-15, Godfrey Decl. ¶¶ 3-6.] When his employment was terminated, Mishra was allowed to, and did, roll his vested balance into an Individual Retirement Account. But his unvested balance was moved to the 401(k) plan's forfeiture account. [*Id.* at ¶¶ 5-7.] It is this latter, unvested portion that Mishra claims was criminally converted.

Under Indiana law, the elements of conversion are (1) knowingly or intentionally (2) exerting unauthorized control (3) over property of another person. Ind. Code §

35-43-4-3(a). "The mens rea requirement differentiates criminal conversion from the more innocent breach of contract or failure to pay a debt—situations the criminal conversion statute was not intended to cover." *Auto Liquidation Ctr., Inc. v. Chaca*, 47 N.E.3d 650, 654 (Ind. Ct. App. 2015).

Magnesita raises two arguments as to why Mishra's claim for conversion fails as a matter of law and accordingly why it is entitled to summary judgment. First, it argues that Mishra's state law claim for criminal conversion is preempted by ERISA. This argument is not fully developed in Magnesita's brief and consequently could be deemed waived. *See Argyropoulos v. City of Alton*, 539 F.3d 724, 738 (7th Cir. 2008). In any event, I need not address it, as Mishra's conversion claim fails under Magnesita's other argument. This second, and dispositve, argument is straight forward: Mishra has no evidence that *Magnesita* took unauthorized possession of his property. Instead, the automatic mechanics of the 401(k) plan simply took effect as to the unvested portions.

In response, Mishra argues instead that his "election of remedies" under his breach of contract claim, either to treat the contract as rescinded at the time of breach or "keep the contract alive," wait for the time of performance and then "sue and recover according to the terms of the contract" or "sue at once to recover the damages due from the wrongful refusal to carry out the contract according to its terms." *See Fisher v. Heymann*, 12 N.E.3d 867, 872 (Ind. 2014). But this argument concerning election of remedies for his *breach of contract* claim misses the mark as to Mishra's claim for *criminal conversion*, an entirely different tort.

Simply, Magnesita has argued there is no record evidence which shows that Magnesita knowingly or intentionally took unauthorized possession of any property of Mishra's. In response, Mishra offers no evidence whatsoever to support these required elements of his claim. That is fatal to his claim. *Celotex*, 477 U.S. at 322 (1986) (holding that summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial"). Magnesita is entitled to summary judgment on Mishra's counterclaim for conversion of his unvested 401(k) benefits. As neither party has raised the issue in particular, I express no opinion as to whether or not these amounts could be available as damages in connection with Mishra's breach of contract claim, only that they may not be recovered under a theory or claim of criminal conversion.

## IV.     Misappropriation of Trade Secrets Under Indiana and Federal Law

Magnesita has sued Mishra for theft of trade secrets under both Indiana and federal law, and Mishra now seeks summary judgment on those claims. The Indiana Uniform Trade Secrets Act, Ind. Code. § 24-2-3-1 *et seq.*, codifies and governs claims for misappropriation of trade secrets under Indiana law. It defines a trade secret to mean "information, including a formula, pattern, compilation, program, device, method, technique, or process, that: (1) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and

(2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." Ind. Code § 24-2-3-2. A person is liable if they misappropriate another's trade secret. *Id.*

The federal Defend Trade Secrets Act (DTSA), a relatively recently enacted statutory regime which took effect in 2016, has similar elements. It authorizes "[a]n owner of a trade secret that is misappropriated" to bring a civil action under the statute. 18 U.S.C. § 1836(b).  It defines trade secrets under nearly the same terms as Indiana law. A trade secret is defined to include "all forms and types of financial, business, scientific, technical, economic, or engineering information . . . whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if" the owner "has taken reasonable measures to keep such information secret" and the "the information derives independent economic value . . . from not being generally known to, and not being readily ascertainable through proper means by, another person."  18 U.S.C. § 1839. "Under the DTSA, 'misappropriation' is defined as 'an unconsented disclosure or use of a trade secret by one who (i) used improper means to acquire the secret, or, (ii) at the time of disclosure, knew or had reason to know that the trade secret was acquired through improper means, under circumstances giving rise to a duty to maintain the secrecy of the trade secret, or derived from or through a person who owed such a duty.'" *Mission Measurement Corp. v. Blackbaud, Inc.*, 216 F. Supp. 3d 915, 920 (N.D. Ill. 2016) (citations omitted).

I focus on the definition of what constitutes a trade secret under each legal regime, because it is on that basis by which Mishra has his strongest argument. Mishra has moved for summary judgment on these two claims primarily by arguing that Magnesita has failed to identify any protected trade secret that was subject to alleged misappropriation by Mishra.

In response, Magnesita offers mostly speculation and a recitation of Mishra's allegedly scurrilous acts. But missing from that response is the identification of a single specific trade secret that Mishra may have misappropriated. Trade secrets are entitled to protection under the law. But before doing so, a party must identify its trade secrets. "[A] plaintiff who seeks relief for misappropriation of trade secrets must identify the trade secrets and carry the burden of proving that they exist." *Zemco Mfg., Inc. v. Navistar Int'l Transp. Corp.*, 759 N.E.2d 239, 245–46 (Ind. Ct. App. 2001) (citation omitted); *IDX Sys. Corp. v. Epic Sys. Corp.*, 285 F.3d 581, 584 (7th Cir. 2002) ("[A] plaintiff must do more than just identify a kind of technology and then invite the court to hunt through the details in search of items meeting the statutory definition[.]"); *U.S. Gypsum Co. v. LaFarge N. Am., Inc.*, 508 F. Supp. 2d 601, 635 (N.D. Ill. 2007) ("In opposing summary judgment, the party asserting a trade secret must identify the trade secret with sufficient specificity.").

Magnesita has failed to identify any such trade secret with specificity—let alone show actual misappropriation of those trade secrets by Mishra. At most, it says that the PowerPoint Mishra received (but did not create) from another Magnesita employee

(who presumably had access to the information) contains trade secrets. So what? How is this proof that Mishra misappropriated a trade secret? This really amounts to nothing more than an *ipse dixit* – it must be theft of trade secret because Magnesita says it is. Such an argument may cut it at the motion to dismiss stage of litigation, but not at summary judgment when it is time to "put up or shut up." *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003) (internal quotations omitted). Accordingly, I will grant Mishra's motion as to Counts I and II of the complaint.

## V.      Breach of Fiduciary Duty Claims

The final claim to address is Magnesita's claim for breach of fiduciary duty against Mishra. "A claim for breach of fiduciary duty requires proof of three elements: (1) the existence of a fiduciary relationship; (2) a breach of the duty owed by the fiduciary to the beneficiary; and (3) harm to the beneficiary." *Tracy v. Minne*, 2018 WL 835387, at *4 (N.D. Ind. Feb. 13, 2018) (quoting *Good v. Indiana Teachers Ret. Fund*, 31 N.E.3d 978, 983 (Ind. Ct. App. 2015)). Mishra argues that as a matter of undisputed fact he did not breach any fiduciary duty he may have owed.[1]

Under Indiana law, employees owe their employers a duty of loyalty. *Kopka, Landau & Pinkus v. Hansen*, 874 N.E.2d 1065, 1070 (Ind. Ct. App. 2007). When dealing with this particular duty, "an employee who plans to leave his current job and go into

---

[1] Mishra does not raise an argument (and thus I express no opinion on the matter) that the breach of fiduciary duty claim is barred or cabined by the existence of his Employment Agreement. *See, e.g., In re Edgewater Med. Ctr.*, 344 B.R. 864, 870 (Bankr. N.D. Ill. 2006) (discussing interplay between breach of contract and breach of fiduciary duty claims under Illinois law and ruling that plaintiff was not limited to breach of contract remedies when fiduciary duty stemmed from contract).

competition with his current employer must walk a fine line." *Id.* As stated by the

Indiana Court of Appeals:

> Prior to his termination, an employee must refrain from actively and directly competing with his employer for customers and employees and must continue to exert his best efforts on behalf of his employer. But an employee may even make arrangements to compete, such as investments or the purchase of a rival corporation or equipment, except that he cannot properly use confidential information peculiar to his employer's business, before he leaves his employ. . . . [These principles] balance the concern for the 'integrity of the employment relationship' against the privilege of employees to prepare to compete against their employers without fear of breaching their fiduciary duty of loyalty.

*Potts v. Review Bd. of Ind. Employment Sec. Div.*, 475 N.E.2d 708, 712 (Ind. Ct. App. 1985)

(internal citations omitted). It is thus no surprise then that "these types of cases are

extremely fact-sensitive." *Id.* But misappropriating an employer's confidential

information is of course a breach of the duty of loyalty. *See N. Elec. Co. v. Torma*, 819

N.E.2d 417, 430 (Ind. Ct. App. 2004).

Mishra does not argue that he didn't owe Magnesita a duty. Instead he argues

that because he has provided a declaration "that he did not pursue a business venture

to compete with Magnesita" and that the company "offers no details as to the business

venture," Magnesita has failed to satisfy any of the three required elements of a breach

of fiduciary duty claim under Indiana law. [DE 110 at 21.] But the question of breach of

fiduciary duty effectively mirrors whether or not Mishra breached his Employment

Agreement (and thus whether or not Magnesita had cause to terminate his

employment). This is an issue that I have already ruled cannot be determined at

summary judgment. As discussed above, there are many disputed questions of material fact surrounding what exactly Mishra was up to in his final two months at Magnesita and whether or not Magnesita acted hastily and pretextually or in good faith to terminate Mishra's employment. Just as those facts prevented me from granting summary judgment in Magnesita's favor on its declaratory judgment claim, they prevent me from finding in Mishra's favor as to whether he breached his fiduciary duty to his employer. And for what it is worth, consummation of a transaction is not the *sine quo non* of a breach of fiduciary duty claim. *See, e.g., Demming v. Underwood*, 943 N.E.2d 878, 890 (Ind. Ct. App. 2011) (holding that actions "in the pursuit of a real estate transaction that had not come to fruition" could constitute a breach of fiduciary duty and denying summary judgment). Thus, simply because Prime may have not ever come into existence, does not mean that there could not have been a breach of Mishra's duty as a matter of law.

Finally, while the harm to Magnesita from this conduct may have been marginal because Prime never got off the ground, I cannot say as a matter of law there could be no harm to Magnesita (another element of the breach of fiduciary duty claim). Making all factual inferences in favor of Magnesita on this claim, as I must, it appears Mishra at a minimum knew about Prime's formation and did not alert anyone at Magnesita, and potentially was even actively involved in the creation of an entity designed to compete against Magnesita. Even if Magnesita suffered no economic damages as a result of Mishra's alleged breach, damages are distinct from harm under Indiana law for

purposes of a breach of fiduciary duty, as there are other remedies such as restitution or disgorgement available for such claims. *Nichols v. Minnick*, 885 N.E.2d 1, 4 (Ind. 2008) ("Restitution, on the other hand, may be measured by the defendant's gain and is therefore appropriate even when the plaintiff has suffered no demonstrable harm.") (reversing trial court and ordering disgorgement in breach of fiduciary duty case with no proof of loss to support tort damages); *see also U.S. Gypsum Co. v. Lafarge N. Am. Inc.*, 2009 WL 3871824, at *4 (N.D. Ill. Nov. 16, 2009) (noting that absent economic loss, damages for breach of fiduciary duty "will be limited to nominal and possible punitive damages"). Magnesita may not recover much in terms of compensatory damages on this claim, but that doesn't mean the claim cannot proceed to a trial and an equitable remedy for the breach fashioned by the court.

## Conclusion

For the foregoing reasons, plaintiff Magnesita Refractories Company's motion for summary judgment [DE 111] is GRANTED, in part, as to Count III of the Counterclaim  (conversion of unvested 401(k)), and as to Count II (payment of variable compensation under the Indiana Wage Payment Statute) in part, and DENIED in all other respects.

Defendant Surendra Mishra's motion for summary judgment [DE 109] is GRANTED, in part, as to Counts I and II of the Complaint (misappropriation of trade secrets) and DENIED in all other respects.

Finally, Mishra filed an after-the-fact Motion for Leave to File Excess Pages [DE

119] as to his opposition to Magnesita's motion for summary judgment. In that filing, Mishra notes that his opposition inadvertently violated L.R. 7-1(e)(1) because his Statement of Genuine Disputes, required by L.R. 56-1, was included within the text of his opposition brief and not as an appendix. Thus he exceeded the 25 page limit on summary judgment opposition briefs. I appreciate Mishra's candor and agree his violation of the local rules, if any, was inadvertent. Accordingly, his Motion to File Excess Pages [DE 119] is GRANTED.

SO ORDERED on December 7, 2018.

/s/ Philip P. Simon
PHILIP P. SIMON, JUDGE
UNITED STATES DISTRICT COURT